# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MICHELLE JULIE RONQUILLO,

     Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security Administration,

     Defendant.

Case No.: 3:18-cv-00306-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 13, 16

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's Motion for Summary Judgment seeking reversal of the final decision of the Commissioner and the payment of benefits. (ECF No. 13.) The Commissioner filed a Cross-Motion to Affirm and Opposition to Plaintiff's motion. (ECF Nos. 16, 17.)

After a thorough review, it is recommended that Plaintiff's motion be granted; the Commissioner's cross-motion to affirm be denied; and, that this matter be remanded for further administrative proceedings consistent with this Report and Recommendation.

## I. BACKGROUND

On July 17, 2014, Plaintiff completed an application for disability insurance benefits (DIB) under Title II of the Social Security Act, alleging disability beginning June 12, 2014. (Administrative Record (AR) 169-175.) The application was denied initially and on reconsideration. (AR 132-141.)

1    Plaintiff requested a hearing before an administrative law judge (ALJ). (AR 143-44.) ALJ

2    John Heyer held a hearing on March 27, 2017, in San Francisco, California. (AR 67-85.) Plaintiff,

3    who was represented by counsel, appeared and testified on her own behalf at the hearing.

4    Testimony was also taken from a vocational expert (VE). On April 26, 2017, the ALJ issued a

5    decision finding Plaintiff not disabled. (AR 10-21.) Plaintiff requested review, and the Appeals

6    Council denied the request, making the ALJ's decision the final decision of the Commissioner.

7    (AR 1-6, 168.)

8    Plaintiff then commenced this action for judicial review under 42 U.S.C. § 405(g) in the

9    United States District Court for the District of Nevada, as she now resides in Nevada. Plaintiff

10    argues that the ALJ impermissibly rejected the opinions of her treating physician, Yvette Bordelon,

11    M.D., Ph.D.

## II. STANDARDS

### A. Disability Process

14    After a claimant files an application for disability benefits, a disability examiner at the state

15    Disability Determination agency, working with a doctor(s), makes the initial decision on the

16    claimant's application. *See* 20 C.F.R. §§ 404.900(a)(1); 416.1400(a)(1). If the agency denies the

17    claim initially, the claimant may request reconsideration of the denial, and the case is sent to a

18    different disability examiner for a new decision. *See* 20 C.F.R. §§ 404.900(a)(2), 416.1400(a)(2).

19    If the agency denies the claim on reconsideration, the claimant may request a hearing and the case

20    is sent to an ALJ who works for the Social Security Administration. *See* 20 C.F.R.

21    §§ 404.900(a)(3), 416.1400(a)(3). The ALJ issues a written decision after the hearing. *See* 20

22    C.F.R. § 404.900(a)(3). If the ALJ denies the claim, the claimant may request review by the

23    Appeals Council. *See* 20 C.F.R. §§ 404.900(a)(4), 416.1400(a)(4). If the Appeals Council

determines there is merit to the claim, it generally remands the case to the ALJ for a new hearing. If the Appeals Council denies review, the claimant can file an action in the United States District Court. *See* 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5).

**B. Five-Step Evaluation of Disability**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his or her physical or mental impairment(s) are so severe as to preclude the claimant from doing not only his or her previous work but also, any other work which exists in the national economy, considering his age, education and work experience. 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  20 C.F.R. §404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.152(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii), (c); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id*. If the claimant has an impairment(s) that is severe, the Commissioner proceeds to step three.

///

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the claimant's impairment(s) meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (d). The Commissioner presumes the Listed Impairments are severe enough to preclude any gainful activity, regardless of age, education or work experience. 20 C.F.R. § 404.1525(a), § 416.925(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(a)(4)(iii), (d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last 15 years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(a).

In making this determination, the Commissioner assesses the claimant's residual functional capacity (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4)(v), § 416.920(a)(4)(v); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545 and § 416.945. In determining the RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of the limitation(s), and medical reports, to determine what capacity the claimant has for work despite his or her impairments. 20 C.F.R. § 404.1545(a)(3) and  416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular pat relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131.

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform other work available in the national economy. 20 C.F.R. §§ 404.1520(e), 416.920(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 528 (9th Cir. 2014). If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a VE or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566(b), § 416.966(b). Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g), § 416.920(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

**C. Judicial Review & Substantial Evidence**

The court must affirm the ALJ's determination if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Gutierrez*, 740 F.3d at 522 (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 523-24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

To determine whether substantial evidence exists, the court must look at the record as a whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ did not apply proper legal standards." *Id.* (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

*///*

# III. DISCUSSION

**A. ALJ's Findings in this Case**

At step one, the ALJ found Plaintiff met the insured status requirements through December 31, 2018, and had not engaged in substantial gainful activity since the alleged onset date of June 12, 2014. (AR 15.)

At step two, the ALJ concluded Plaintiff had the following severe impairment: status post implantation of deep brain stimulator to control tremors. (AR 15.)

At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 15.)

At step four, the ALJ assessed Plaintiff as having the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except she could lift 20 pounds; sit, stand and walk for six hours in an eight-hour day; and, use the hands on an occasional basis for work-related activities. The ALJ also found that Plaintiff had no significant work-related mental health limitations. ( AR 15-20.)

The ALJ then concluded Plaintiff was unable to perform any of her past relevant work. (AR 20.)

At step five, the ALJ determined, based on VE testimony, that considering Plaintiff's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including: call out operator (Dictionary of Occupational Titles (DOT) number 237.367-014); and surveillance system monitor (DOT number 379.367-010). (AR 21.) As a result, the ALJ found Plaintiff not disabled from June 12, 2014, through the date of the decision—April 26, 2017. (AR 21.)

///

///

7

**B. Relevant Evidence**

**1. Medical Records**

According to the medical records, Plaintiff suffered from an essential tremor for approximately 16 years before being evaluated by Dr. Bordelon at UCLA's Movement Disorders Clinic for placement of a deep brain stimulator (DBS) to manage her tremor. Initially, the tremor affected mainly her right hand, but she later began to experience symptoms in her left hand as well. She occasionally had a tremor in her head and legs, as well as a vocal tremor. The tremor became more pronounced during times of stress or anxiety. At the point when she consulted with Dr. Bordelon, she had failed multiple medication trials, and she reported the tremor significantly impaired her ability to independently function. She had to use two hands to complete routine activities of daily living, including eating, drinking, dressing and hygiene. She had stopped working because it had been difficult to use her hand in retail sales. (AR 276-80.)

Plaintiff underwent surgery for placement of the DBS on June 12 and 24, 2014. (AR 280-286.) She saw Dr. Bordelon for initial programming of the DBS on July 2, 2014, and at that point she reported a new onset of bilateral headaches since the surgery. She had some improvement for the headaches with taking Tylenol. She did not feel any improvement regarding her tremor since the surgery. Despite the headaches, she was described as doing quite well. (AR 321-23.) At a follow up on August 13, 2014, the headaches persisted. They occurred daily, and waxed and waned throughout the day. The headaches caused her to stay home and not go outside. Again, she reported some improvement when taking Tylenol. Regarding the surgery and her tremor, she felt no difference. The tremor would get worse as the headaches got worse. She continued to have problems drinking with a cup. (AR 317.) On examination, mild clumsiness of the right hand was noted, which was not seen before (the surgery). Dr. Bordelon tried increasing the voltage on the

device, but this resulted in side effects, including lip twitching and shortness of breath, and tingling. They tried another configuration and Plaintiff would be monitored. (AR 319.)

A progress note from September 21, 2014 from Ajitpal Tiwana, M.D., states that it was recommended that Plaintiff refrain from working due to bilateral hand tremors that impair many of her activities of daily living including writing, typing and drinking. It was noted that it could take six to eight months for the surgery to help control the tremors. She was also suffering from post-surgical headaches, which were also described as moderate to severe migraines, where she cannot tolerate any light or sound and has to stay indoors. The migraines occurred for hours in a day and were unpredictable in nature. (AR 319-320, 378.)

In October of 2014, she indicated she had minimal improvement in the tremor since the surgery. She still had headaches with associated photophobia, and did not leave the house most days, but the headaches had improved since the last appointment. That day, she had a moderate right-sided tremor, especially with holding her hands up. She also had a mild left kinetic tremor. (AR 379.)

She reported minimal improvement in the tremor at her February 4, 2015 appointment. She still had impairment when writing more than two or three sentences. She had to use two hands to eat and drink from a cup, and had to drink fast. When typing, she had cramping and numbness in her fingers. She had a moderate right-sided tremor especially when holding her hands up, which got worse as she put her hand to her mouth. She also had a mild left kinetic tremor. The voltage was increased and she experienced improvement in the tremor. (AR 381-83.)

Her next appointment was on May 14, 2015. She reported improvement in her handwriting, but it was still difficult to write. She indicated that she would have improvement in the tremor for about a week after the voltage change, but then she would return to baseline. Writing was difficult,

and she could only type for about five minutes before her hands would become numb. She had to use two hands to drink out of a cup, and had difficulty eating. Activities of daily living such as cleaning and working in the kitchen could be very difficult, and she could not use a knife to cut safely. (AR 384-85.) She saw Dr. Bordelon again on May 27, 2015, who reported that in general, Plaintiff had not responded as well to the surgery as they wanted her to. She had side effects with configuration changes, and minimal improvement in her tremors. She still felt impaired in activities of daily living, and especially with writing. She still had to use two hands to drink from a cup, and could only eat with an enlarged spoon. Cleaning was still difficult. That day, she had mild cogwheeling on the right upper extremity, and a mild action and posture tremor there as well. A new configuration was tried, and she felt much improved. (AR 385-87.)

On September 9, 2015, she indicated that she had some mild benefit for the tremor for about a month, but then it returned to essentially where it was before the surgery. She still reported difficulty with activities of daily living, including drinking from a cup and writing. She also had pain in both hands. She had a postural and kinetic tremor in the right upper and lower extremities. Her handwriting was mildly impaired. She had increased tremor in the right hand when mimicking drinking from a cup. The settings of the stimulator were adjusted. (AR 389-91.)

On December 1, 2015, she was still having tremors in both hands, and her whole body would shake if she was nervous. She reported headaches and pain in her right wrist. She was assessed with carpal tunnel syndrome. (AR 373-74.)

She saw Dr. Bordelon on January 27, 2016, and indicated that she initially benefitted after the last change of settings, but over time the tremor went back to baseline. She also noted a tremor beginning to bother her left hand. She was also depressed and had anxiety, which aggravated the tremor. She had a postural and kinetic tremor in the right upper extremity, and had mild difficulty

10

with tandem gait. Since undergoing surgery, her improvement was described as modest. The voltage was adjusted to try and manage the tremor. (AR 391-394.)

On February 25, 2016, she was still having tremors in both hands, and pain in both wrists. She was assessed with right median sensory/motor neuropathy at the wrist, consistent with mild carpal tunnel syndrome. (AR 370.)

When she saw Dr. Bordelon on April 6, 2016, she indicated that she had initial improvement after the last stimulator configuration, but then her tremors returned. She had tried increasing the voltage, but felt side effects of increasing anxiety and palpitations. In general, she felt the tremor was unchanged and continued to be debilitating, especially when she focused on fine motor tasks, in which case a tremor developed in the left hand as well. The configuration was adjusted again, and discussed the option of implanting a device for the tremor in the left hand, but she was cautioned that the side effects were much higher with bilateral stimulation. (AR 394-96.)

On April 15, 2016, she continued to have tremors in both upper extremities, which were worse on the right, and pain and numbness in the wrist. On examination, a tremor in both upper extremities was observed. (AR 368.)

When she saw Dr. Bordelon on August 17, 2016, she felt that the DBS was not making much difference. She was still having issues eating and drinking. She felt the tremor in the left hand was getting worse. On examination, she had a right upper extremity tremor at rest, but this resolved with distraction. She also had a postural and kinetic tremor in the right upper extremity, and a mild postural tremor in the left hand when demonstrating holding a mirror. The stimulator was adjusted, which greatly improved the tremor. (AR 397-99.)

At her November 2, 2016 appointment, she reported doing well and liked the configuration she was using, and felt the right upper extremity tremor was improved. She described having

significant improvement since the last adjustment. She still had some tremor and mild difficulty eating, but noticed a "marked improvement." She had some mild side effects but they were manageable. On examination, she had a very mild bilateral upper extremity kinetic tremor, and had mild difficulty with tandem gait. Dr. Bordelon stated that the most recent programming had greatly improved her tremor. (AR 402.)

### 2. Medical Opinions

State agency reviewing physician Crystal Fo, M.D., opined on October 2, 2014, that Plaintiff could use her right hand frequently, and left hand occasionally, and should avoid concentrated noise exposure due to her headaches. (AR 114.) State agency reviewing physician, A. Resnik, M.D., adopted the same opinions on March 11, 2015 (at the reconsideration level). (AR 127.)

Dr. Bordelon completed a residual functional capacity questionnaire on August 22, 2016. (AR 376-77.) She opined that Plaintiff could sit, stand and walk less than four hours in an eight-hour day; she could rarely lift and carry up to ten pounds due to her tremor; she could not use her hands for handling, pushing and pulling or fine manipulation; she had manual and finger dexterity estimated in percentile comparison to general population of 11 to 33 percent in the right and left; she could rarely crawl, climb, reach up or reach forward; she could frequently bend/stoop, squat, crouch and kneel (noting that balance was difficult due to her tremor); she could never tolerate exposure to unprotected heights, being around moving machinery, being exposed to marked temperature changes, being exposed to dust, fumes and other irritants, or noise; she could frequently drive (but not heavy machinery).

///

///

### 3. Hearing Testimony and Functional Statements

On March 27, 2017, Plaintiff testified that she had stopped working after her brain surgery. She had expected to go back to work after the surgery and her recovery, but she did not get any better. (AR 71.) She testified that her hands would still shake and it was hard to hold anything. She was sensitive to light and had bad migraines. (AR 71.)

The ALJ specifically asked her about the progress note entry from November 2, 2016, which noted marked improvement in her tremor. She testified that the DBS procedure had helped in some ways, but she still had shaking in her hands. She still had difficulty eating, and had to eat with a spoon, and very fast to keep the food from falling out of the spoon. (AR 72.)

In a typical day, she would wake up and get her children up and off to school. Then she would do some light cleaning at home, shower, and makes her bed. Her mom visited during mid-morning to help her. When her kids got home from school, she watched over them while they did their homework. (AR 72.)

Her children did the chores around the home. She could wipe down the bathroom sink with a rag and wipe, but could not do scrubbing. She could wash a cup and plate, but did not wash pans. She did light cooking to prepare simple meals, and the kids helped her, including with chopping. (AR 73.) She could throw a load of laundry in the washer, and her children would take it out and put it in the dryer. She could pick items at the grocery store, but had her children push the cart for her, and she did not hold, load or unload the groceries. She could watch television and read. She could use the mouse for the computer, and could type her name and address. (AR74.) She used a Bluetooth headset for the phone. (AR 74.) She could not exercise and had no hobbies. (AR 75.) Her mother and oldest daughter help her "100%" with her other children. (AR 78.) On an average day, she would rest for about an hour at about 2:00 p.m., to try and relax her body. (AR 78.)

1    She estimated she could lift five pounds; she could stand 10 minutes before her back started

2  to hurt and she would need to move around; she could walk for 15 minutes; and, she could sit for

3  10 minutes. (AR 79-80.)

4    She confirmed that the tremors were her only limitations. She took medication for the

5  tremors, which helped some, but not a lot. She also took ibuprofen for pain. (AR 75.) Stress

6  aggravated her tremors. (AR 77.)

7    She did not feel she could do the cashier work she did in the past because her hands start

8  shaking really badly when she starts lifting anything. (AR 76.) Pushing numbers also caused her

9  hands to cramp up. (AR 76.)

10    Plaintiff completed an adult function report, and stated that her shaking in the right hand

11  had limited her ability to write, type and pick up heavy objects. Both hands would stiffen up while

12  holding a heavy object or doing something for long periods of time. (AR 216.) She did light

13  cleaning and light cooking with the help of her children. (AR 217.) She did small chores such as

14  making the bed and wiping down the counters with the help of her children. (AR 219.) Household

15  chores caused her hand to shake badly, and she did not do yard work. She needed help all the time

16  to open doors, push carts and pick up heavy objects when she would go out. (AR 220.) She could

17  drive only short distances. (AR 220.) Her children helped her to push the cart, lift and bag while

18  shopping. (AR 220.) She liked to read, but she could not hold a book or tablet because her hand

19  starts to shake and cause her pain. (AR 221.) Since her surgery, she would go places with her

20  children or a family member in case she had head pain or needed help opening or carrying objects.

21  (AR 221.) She had difficulty lifting, and with reaching her hand would shake and her hand and

22  arm would become numb. (AR 222.) Stress triggered her tremors. (AR 223.)

23

Her daughter completed a third-party adult function report, and stated that Plaintiff's right hand would shake uncontrollably, and it was hard for her to work or do household chores, or her duties as a mother. (AR 226.) The children helped her to prepare meals and do chores. (AR 227.)

**4. ALJ's Findings**

While the ALJ found Plaintiff's medically determinable impairment could reasonably be expected to cause her alleged symptoms, he found her statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record. (AR 16.)

The ALJ stated that while Plaintiff claimed that her tremor prevents her from working, she did light cleaning and cooking with the assistance of her children; she took care of her children; she prepared simple meals; she cleaned; made her bed; wiped down counters; she went outside once or twice a week; she shopped in stores and handled her finances; and, she had no problem with personal care. (AR 16-17.) She reported she could not lift or reach because her hand would shake, but the ALJ pointed out that she drives, goes grocery shopping once a week, goes to church on a regular basis and had no problems getting along with others. (AR 17.)

The ALJ stated that the record did not document objective clinical findings establishing Plaintiff was not able to perform work. The ALJ concluded that her tremor did not appear to limit her ability to perform work related activities. The ALJ then summarized the medical records.

The ALJ stated that despite Plaintiff's alleged impairments, she engaged in somewhat normal level of daily activity, and her ability to do so undermined the consistency of her allegations of disabling functional limitations. The ALJ concluded that the record reflected that the surgery was generally successful in relieving the symptoms. In addition, she had been prescribed medications that were relatively effective in controlling her symptoms.

The ALJ also stated that the objective findings overall were minimal; her complaints were not consistent; and treatment since surgery had been conservative and was generally limited to medication. He again stated that she cooked, did small chores, made her bed, wiped down counters, shopped, took care of her children, went to church and helped her children with their schoolwork. (AR 18.)

The ALJ addressed the opinions of the State agency reviewing physicians, and gave these opinions little weight because they were less limiting than what was indicated by the medical records. (AR 18-19.)

The ALJ noted the opinions of Plaintiff's treating physician, Dr. Laurice T. Yang, in September 21, 2014, and May 14, 2015, that Plaintiff could not obtain employment due to her tremors. (AR 19.) The ALJ did not give Dr. Yang's opinions great weight, finding that Plaintiff's own testimony contradicted the opinions and were at odds with findings on examination and recent treatment notes documenting marked improvement in her symptoms. (AR 19.)

The ALJ also discussed Dr. Bordelon's residual functional questionnaire. The ALJ said he did not give Dr. Bordelon's opinions great weight because they were directly contradicted by Plaintiff's own testimony, and were at odds with findings on examination and recent treatment notes documenting marked improvement in her symptoms. (AR 19.)

**C. Evaluation of Medical Opinions**

 "'In disability benefits cases … physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "Courts 'distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

claimant (examining physician); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). "'As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.'" *Id.* "[T]he opinion of a treating physician is thus entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012 (citing *Ryan*, 528 F.3d at 1198).

"If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (citation and quotation marks omitted); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2))). "Greater weight is also given to the 'opinion of a specialist about medical issues related to his or her area of specialty.'" *Revels*, 874 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)(5)). "'The weight afforded a non-examining physician's testimony depends on the degree to which [he or she] provide[s] supporting explanations for [his or her] opinions." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, 759 F.3d at 1012. "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight … even if it does not meet the

17

test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725). "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id*. (citation omitted).

**D. Analysis**

The ALJ rejected Dr. Bordelon's opinions because he found the opinions were: (1) contradicted by Plaintiff's own testimony, and (2) were at odds with her more recent treatment notes that documented marked improvement in Plaintiff's symptoms.

**1. Does Substantial Evidence Support the ALJ's Conclusion that Dr. Bordelon's Opinions were Contradicted by Plaintiff's Own Testimony?**

First, Plaintiff acknowledges that an ALJ may discount a treating physician's opinion when the opinion is inconsistent with the claimant's testimony. Plaintiff argues, however, that the ALJ must articulate what testimony contradicts the opinion and the ALJ failed to do so here. In addition, Plaintiff argues that Dr. Bordelon's opinion was offered in the context of work-related limitations, and Plaintiff's testimony about her daily activities reflected her abilities in a typical day where she could receive help, rest, and perform activities at her own pace. Finally, Plaintiff contends that her testimony was not in fact inconsistent with Dr. Bordelon's opinions. She points to her testimony that her mother and daughter help her; her mother drove her to her appointments at UCLA; her children did chores and helped with preparing meals, washing dishes, and doing laundry; she had difficulty lifting things, and pushing numbers would cause her hands to cramp up; she could not lift a gallon of milk with one hand; and she could not hold a cup of water to drink without shaking.

The Commissioner argues that the ALJ may properly reject the opinions of a treating physician of further limitation beyond the assessed RFC based on inconsistency between the opinions and Plaintiff's daily activities. To support the ALJ's decision, the Commissioner points to Plaintiff's ability to: drive; prepare simple meals; make her bed; wipe down counters; put a laundry load in; shop in stores; and, handle her own personal care and finances. The Commissioner contends that her ability to do these activities is consistent with a finding that Plaintiff could use her hands for work activities up to an occasional basis.

The question is whether substantial evidence supports a finding that there was inconsistency between Plaintiff's testimony and Dr. Bordelon's opinions.

Critical here are Dr. Bordelon's opinions that Plaintiff could rarely lift and carry up to ten pounds due to her tremor; she could not use her hands for handling, pushing and pulling or fine manipulation; she had manual and finger dexterity estimated in percentile comparison to general population of 11 to 33 percent in the right and left. Occasional means "from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at * 5. So, Plaintiff would use her hands at most, for one-third of the day.

The court finds that insofar as the ALJ rejected Dr. Bordelon's opinions because they were inconsistent with Plaintiff's testimony, the ALJ's determination is not supported by substantial evidence in the record.

First, as Plaintiff points out, the ALJ did not describe *what* he found to be contradictory about Plaintiff's testimony when compared to Dr. Bordelon's opinions. When rejecting a treating physician's opinions, the ALJ "must do more than state conclusions. He must set forth *his own interpretations and explain why* they, rather than the doctors', are correct." *Garrison*, 759 F.3d at 1012 (citation omitted).

Second, the ALJ impermissibly ignored or understated Plaintiff's testimony concerning the limited nature of what she can do. In addition, for most activities the ALJ relied, the ALJ did not acknowledge her testimony that she performed these activities with the help of her children and mother. In *Garrison v. Colvin,* 759 F.3d 995, 1016 (9th Cir. 2014), the Ninth Circuit found that the ALJ erred where the ALJ mischaracterized the claimant's testimony when the ALJ ignored the testimony that she was heavily assisted by her mother in performing many daily activities, and that pain precluded her from engaging many activities and she required rest throughout the day. The court reiterated that "impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Id*. (citations omitted). The Ninth Circuit cited a decision of the Seventh Circuit noting "[t]he critical differences between activities of daily living and activities in a full-time job[.]" *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). The Seventh Circuit noted that with the former, a person has more flexibility in scheduling and can get assistance from others. *Id*. "The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Id*.

Instead, Plaintiff's testimony appears to be consistent with Dr. Bordelon's opinions regarding her ability to lift and utilize her hands. *See Garrison,* 759 F.3d at 1016 (finding that claimant's testimony regarding daily activities with assistance and taking rests were consistent with pain testimony and inability to function, and ALJ's reasoning did not satisfy the clear and convincing reasons requirement to discredit the claimant's testimony).

Plaintiff testified that her hands would shake and it was hard to hold things. While she did light cleaning, she clarified that this included wiping down the bathroom sink with a rag, but she could not do any scrubbing, and her children performed most household chores. Her mother would

20

come visit her mid-morning to help her. She testified that she would watch over her kids while they did their homework. It is not clear how helping with homework or watching over with homework would contradict an opinion that she could not use her hands or lift over 10 pounds in a work setting. She would do some light cleaning and light cooking, but she specifically testified that her children helped do the chores and with preparing meals. She could wash a cup and a plate, but could not wash pans. She could put a load of laundry into the washer, but her children had to take it out and put it in the dryer. She testified that she did go grocery shopping, but her children push the cart for her, and hold, load and unload the groceries. She stated that her mother and oldest daughter help her "100%."

She clarified that she only drives short distances and did not have her own vehicle, and her mother drove her to her doctor appointments at UCLA. She also testified that since her surgery, she went places with her children or a family member in case she has head pain or needed help opening or carrying objects.

In sum, the ALJ did not set forth sufficient reasons supported by substantial evidence in the record in rejecting Dr. Bordelon's opinions.

**2. Does Substantial Evidence Support the ALJ's Conclusion that Dr. Bordelon's Opinions Were at Odds with More Recent Treatment Notes that Documented Marked Improvement in Plaintiff's Symptoms?**

Second, the ALJ rejected Dr. Bordelon's opinions because he found them at odds with recent treatment notes that showed marked improvement. Plaintiff argues that these most recent notes did not undermine the totality of Dr. Bordelon's opinions, asserting that periods of improvement must be read in the context of the overall diagnostic picture, and the "marked" improvement in November of 2016 is relative.

1    The Commissioner asserts that it was reasonable to find Plaintiff's condition had improved

2  where there were reports of "marked improvement" of her tremors.

3    The statement regarding marked improvement is in the last medical record from

4  Dr. Bordelon, from November 2, 2016. Up to that point, the records reflect that Plaintiff would get

5  temporary and minimal relief from the DBS stimulator, but then would return to baseline. She

6  continued to have trouble with the tremor.

7    The ALJ specifically asked Plaintiff about that particular progress note entry at the hearing,

8  and Plaintiff testified that the DBS procedure had helped in some ways, but she still had shaking

9  in her hands. In her function report, she indicated she was worse since the surgery. The ALJ also

10  did not mention her testimony or the medical record entries indicating that stress triggers her

11  tremors.

12    The ALJ said that Plaintiff's surgery and medication were successful in controlling her

13  tremor. She testified that she still had issues with the tremor, and that she took medication, which

14  helped some, but not a lot. She testified that her hands would shake badly when she tried to lift

15  anything, and pushing numbers causes her hands to cramp up.

16    In sum, the ALJ erred in picking one record noting improvement and ignoring the overall

17  picture of her condition, as well as her testimony concerning how she was affected by the tremor

18  post-November 2, 2016. *See Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) (citations omitted)

19  ("Occasional symptom-free periods … are not inconsistent with disability.").

20  **E. Harmless Error?**

21    Finally, the Commissioner argues that for the surveillance system monitor position, there

22  was no reaching, handling, fingering or feeling in the job. Therefore, the Commissioner argues

23  that even if the ALJ erred in rejecting Dr. Bordelon's opinion that Plaintiff could not use the upper

extremities for handling, pushing and pulling or performing fine manipulation, Plaintiff would still be able to perform the surveillance job, and any error regarding the RFC limitation would be harmless.

The description of the surveillance system monitor includes "[p]ush[ing] the hold button to maintain surveillance of location where incident is developing" and "[a]djust[ing] monitor controls when required to improve reception[.]" DOT 379.367-010. The DOT entry also states that the job requires exerting up to 10 pounds of force occasionally, and a negligible amount of force frequently. *Id.* It does state that the finger dexterity and manual dexterity were the lowest 1/3, excluding the bottom 10%, and that the position would not require reaching, handling, fingering. *Id.*

Without the benefit of VE testimony on the topic, the job description of requiring pushing buttons and adjusting controls seems to contradict the statement that the job includes no reaching, handling or fingering. There is evidence in the record that Plaintiff's tremor was exacerbated when she had to lift her hands, and that her hands became numb when pushing. In addition, the description says that the job would require exerting up to 10 pounds of force occasionally… to "lift, carry, push, pull or otherwise move objects[.]. This appears contradictory to Dr. Bordelon's opinion that Plaintiff could lift/carry 10 pounds rarely.

In the absence of VE testimony on this issue, the court cannot conclude that the error would be harmless insofar as the DOT description of the surveillance system monitor position is concerned.

**F. Remand for Further Proceedings or for Calculation and Award of Benefits**

Plaintiff seeks an order reversing the final decision of the Commissioner and ordering the payment of benefits. Alternatively, she asks for a remand for further administrative proceedings.

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court." *Revels v. Berryhill*, 874 F.3d 648, 668 (9th Cir. 2017) (citation and quotation marks omitted); *see also Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017), *as amended* January 25, 2018 (The credit-as-true "rule itself permits, but does not require, a direct award of benefits on review..."). "[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded for further proceedings." *Revels,* 874 F.3d at 668 (citation and quotation marks omitted).

"An automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Leon,* 880 F.3d at 1044 (citation omitted). That is to say, "[w]hen the ALJ denies benefits and the finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Id*. at 1045 (citation omitted).

A case *may* be remanded for the calculation and award of benefits if several criteria are met. First, the ALJ must have "failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion." *Leon*, 880 F.3d at 1045. Second, the record must be fully developed such that further administrative proceedings would serve no useful purpose. *Id*.; *see also Revels*, 874 F.3d at 668. When these two conditions are satisfied, the improperly discredited evidence is credited as true, and the court must determine whether the ALJ would be required to find the claimant disabled on remand and whether "on the record taken as a whole, there is no doubt as to disability." *Leon*, 880 F.3d at 1045; *Revels*, 874 F.3d at 668.

Here, the court has determined that the ALJ failed to provide legally sufficient reasons for rejecting Dr. Bordelon's opinions, satisfying the first factor of the credit-as-true criteria.

24

Second, the court must determine whether the record is fully developed and if further administrative proceedings would serve any useful purpose, and whether there is any question as to whether Plaintiff qualifies as disabled.

A problem with the record that the court observes is that Dr. Bordelon's opinion was rendered in March of 2016. The record noting marked improvement was from November of 2016. Plaintiff reported still suffering from the effects of the tremor, difficulty eating and holding items, when she testified in March of 2017. It would have been helpful to have an updated opinion from Dr. Bordelon that post-dated the November 2, 2016 record, indicating whether the opinions remained the same, or some sort of reconciliation of this issue by the ALJ.

Additionally, it is not clear on the current record whether Plaintiff could perform the surveillance system monitor job given her upper extremity limitations.

With this in mind, the court finds that the Commissioner's decision should be reversed and remanded for further proceedings, instead of reversed for the calculation and award of benefits.

With these issues in mind, it is recommended that this matter be remanded for further proceedings so that the ALJ may obtain an updated functional opinion from Dr. Bordelon and determine, likely in conjunction with VE testimony, whether other work still exists in significant numbers in the national economy that Plaintiff could perform given her limitations.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order: **GRANTING** Plaintiff's motion (ECF No. 13) and **REVERSING AND REMANDING** the decision of the Commissioner for further proceedings consistent with this Report and Recommendation; and **DENYING** the Commissioner's cross-motion (ECF No. 16).

///

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED:  June 6, 2019.


William G. Cobb
United States Magistrate Judge